It took me 13 years, Sharon, but I got it. Please proceed. Good morning, Your Honors. May it please the Court? I'm Joshua Waldman, representing the Appellant Secretary of Health and Human Services. In this Vaccine Act case, the Special Master reviewed all the relevant evidence and drew plausible and rational inferences from that evidence to find that Petitioner did not meet his burden of proving an actual causation by a preponderance of the evidence. The medical literature did not support Petitioner's claim. His experts' views were based on assumptions that were persuasively rebutted by the government's as well as the medical literature. There's three different prongs of all of them. Yes. All right. Which do you want to focus on as your strongest argument? Well, let's start with prong one, which is that there was no medical theory. Are you starting there because it's first or because you think it's your strongest argument? Well, I think that they're all strong. In my view, I think that's the strongest, but I think that we can win on any and all of the three prongs if the Special Master held. Okay. So if you're asking my opinion, I think we should start with prong one. Well, wait. Was this medical often won, the medical theory? Does that have to be in the literature? Does the theory have to be written up by the American Academy or whatever? No, it doesn't have to be. There's no requirement of it. So a qualified expert doctor in the field can propose a theory, right? That's correct. And the Special Master... And what was the theory that was proposed here? The theory here was that the hepatitis B vaccine causes chronic fatigue syndrome through a reaction, what was called a cytokine cascade, which in turn causes a series of events that result in chronic fatigue syndrome. Right. And what the Special Master found was he acknowledged that you don't necessarily need medical literature, but he examined it anyway because it was offered by the petitioner. And the Special Master said, I understand that there's a theory of how this cytokine cascade causes chronic fatigue syndrome. And you persuaded me as to that. The missing link, the Special Master said, is that you haven't shown that the hepatitis B vaccine, the particular vaccine in this case, can cause that kind of reaction. That might be an explanation in theory, but you haven't shown the vaccine causes that series of events. And he said... Why does that undermine the theory? Because you need to show that the vaccine at issue in the case was the cause, in fact, of the injury. So having a theory about what causes the injury... That's Alton 2, isn't it? Well, that's... Isn't that Alton 2? Well, sometimes the two prongs do meet... Yeah, but let's take them separately. Sorry? Take them separately. Take them separately. I think here, the Special Master did say that the absence of a plausible theory informed his overall logical sequence. And in fact, he recited the same evidence, some of the same evidence that went to prong 1 as to prong 2. And I think that sometimes that they do overlap. But the theory here was that the government experts explained, and the Special Master found it to be persuasive, that the hepatitis B vaccine, in particular, uses what is called a surface antigen that has a weaker immunological response. And the government experts explained, because of that, you can't simply assume that the hepatitis B vaccine will cause a response that other vaccines might. But again, I still think that you're into the second prong at this point. Because there was a plausible theory by experts who are in the field who study this, and they said that it could happen. Part of the government's evidence, as I understand it, was the reason they didn't think it happened in this case, is that the last hepatitis B vaccine would have had a less likely antigen effect because of the fact that there was already an immunity buildup. Well, I would like to go back to the original thing. I don't think they established that hepatitis B vaccine generally can cause chronic fatigue syndrome. That's actually not what the Special Master held. He said a cytokine cascade could lead to chronic fatigue syndrome. But he said the missing part is you haven't shown that the hepatitis B vaccine causes that cytokine cascade. That's the missing link. But the problem is what he was demanding of prong 1 is what my problem is. Because prong 1, the whole point of the way the Vaccine Act is set up, is to say you don't have to prove, you don't have to have epidemiological studies, or you don't have to have actual established science that is broadly accepted. You just have to have a theory that it could. You have to have a theory that this particular vaccine could. And their theory was to just assume that the hepatitis B vaccine could cause it like other vaccines. My recollection, and I might be wrong, is that there was not a general assertion that hepatitis B could, in every case, the antigen be enough to cause the cascade of events, but that it was possible with regard to this particular individual because he had some autoimmune issues that he was otherwise confronting, which may have made him more susceptible to the effect of the antigen than the average person. Why? I mean, I don't think that you would stand here and say they have to establish that it causes it or could cause it in any person, right? No, they have to cause it in a particular individual. Right, right, in a particular person. And my recollection was that they singled him out as uniquely susceptible by virtue of another autoimmune issue he had. And why wouldn't that have been persuasive in terms of creating a medical theory? Just probe three, right? Right, right. Remember here what we're talking about is the special master made a finding, and there could be evidence in a case that supports the petitioner and other evidence that supports the government. And the special master candidly conceded in here. He didn't say this was a one-sided case. He said there is evidence on petitioner's side. But I look at the totality of the evidence, and I have to weigh it all. And then with the court of federal – and he made a finding that he thought the most persuasive evidence was the government had rebutted the theory that in this particular case, the hepatitis B vaccine caused the injury. The medical literature didn't support it. And looking at the totality of the evidence, the special master came to his conclusion. And the only question for the court of federal claims is, was that finding arbitrary or capricious? Not what you might come to your own conclusion if you were a de novo factor, fact finder, because the court is not a de novo. But I think a lot of what you're describing are things that go into prong two. So why don't you move to prong two? Okay. All of those things, if Your Honor thinks of those things as prong two, the special masters, when they got – Could we ask a question about prong three? Sure. What was the evidence here of the medically recognized onset period? Well, the only evidence offered by petitioner was a statement by Dr. Oleski, his expert, who said that symptoms, as a general matter, occur within a day, immediately a day or a week. And the other expert said a day. Isn't that correct? I think Dr. Bell said a day. But the biggest timeframe, excepting the most generous reading of the experts, was a week. And so what the special master did is said, I don't see persuasive evidence that the onset of symptoms occurred within that week or even the two weeks. Because what happened is – So we've got to get – now we come to the testimony, right? Are you – you're comfortable with the point that there was a medically recognized onset period of a day to a week? I think that's – yes. You're not challenging that? I'm not challenging that. Okay, fine. So now we take the mother's testimony that the person, the child, had adverse reactions during that time period. Right. And the special master found that that evidence, as a fact, on your way – The special master did find that evidence on the ground that he found that there was conflict in the testimony. It was internally inconsistent. It was conflicted by the record. The Court of Federal Claims rejected that analysis, correct? Yes, that's correct. So don't you have to explain why the Court of Federal Claims was incorrect in rejecting that analysis? I'm happy to do that right now, Your Honor, because the standard of review that Congress sets out for the Court of Federal Claims – Oh, no, you're happy. You're willing to. I'm happy to be here, Your Honor. There's nothing happy about any of these cases. I'm happy. Well, I'm employed, so that makes me happy. Your Honor, the Court of Federal Claims has a very narrow standard of review set out by Congress. The only question is whether the special master's factual findings, including the credibility of witnesses, is arbitrary or capricious. And as this Court has said, that when the special master looks at the relevant record evidence and draws plausible and reasonable inferences from that, that cannot be overturned. Well, that's one thing I don't understand. Your standard of review – I mean, the standard of review language here parallels the APA, right? So we've got a bazillion cases to measure it against. And I find a little confusing your application of the arbitrary and capricious standard in the brief. And I'm wondering if I'm misunderstanding it or if you mean to go quite as far as you do. I might be over-reading what you wrote. Okay. I kind of read what you wrote as saying no re-weighing is permissible. Let me tell you how I think of arbitrary and capricious. Arbitrary and capricious, I don't really see much of a difference between it and substantial evidence, to be honest with you. I challenge you to find a case that satisfies one and not the other. So I guess I don't think of arbitrary and capricious as entirely excluding a review of the evidence. Now, it reviews the evidence under an incredibly deferential standard and doesn't allow the kind of re-weighing that you argue Judge Graydon did. I get that. What I don't understand is are you suggesting to me that the arbitrary and capricious standard prevents even a substantial evidence form of review to a factual determination? No, I'm not saying that. I'm trying to use it as – That makes me feel a lot better. I'm using it as a distinction from de novo review, Your Honor. Okay. And there's – You said in the brief it doesn't permit re-weighing the evidence. Well – That seems to be a slightly more – slightly broader exclusion than I think this arbitrary and capricious standard stands for. I think it doesn't permit re-weighing the evidence like Judge Graydon did. Fair enough, but – Well, Your Honor, I only – Porter's the decision that I was either quoting or paraphrasing, and I think it uses the phrase re-weighing the factual evidence as being impermissible. So I would defer to what this court's reading of Porter is. I don't – Well, forget our reading of Porter. I mean, the APA standard is so well set out, and I didn't understand arbitrary and capricious as applied to fact findings preclude any review of the APA standard. I'm not trying to make an arbitrary and capricious standard that's different from what is well known under the APA. What about the fact that so much of this turns on a credibility determination, and he never witnessed the testimony? Well, he did offer Petitioner to put the mother back on the stand in front of the special master, and they declined. But the special master's credibility findings had nothing to do with demeanor, like reading the character. They were about the fact that her own testimony was internally inconsistent, the special master's view, and contradicted by the paper record. But not testimony as to this particular timeframe, because as to the – there was no dispute that the child actually did not go to school those two days, right? Well, no, but the – well, there's a couple of things. One is that her own report to the doctor, as in the medical record, was saying he got sick two weeks after, not in the days immediately after. There was internal inconsistency about was it low grade, high grade, sore throat, not sore throat. There's no dispute that the special master found she said he was absent from school all through November and December, and the school records don't support that point. Well, there also – wasn't there a conflict between the grandmother and the mother? Yeah, the grandmother said he went right back to school. The mother testified that the child continued to attend school. Yes, and so the point is that the special master looked at all this evidence. But the school records said that he wasn't there those two days, right? Yes, but he was – it also showed that later on in November, he was there all during that time. So her testimony was he just missed all of November. I don't understand. Okay, so the school records potentially disprove her testimony as to other days in November, but they actually corroborate her testimony as to the two days immediately after the vaccine. So what's the basis for rejecting her testimony under that theory? Because there's no evidence that he had an onset of symptoms during that time. She went to the doctor and reported to the doctor he got sick two weeks after the vaccine. Did he say he got sick two weeks after the vaccine, or are you talking about the November of roughly 19? I might not be getting it right. Doctors, is it where she says he's had a fever for the last two days? No, I'm talking about the January of the following year. The affidavit? No, the medical records. I'm trying to remember which one. The medical records. She goes to the doctor, and there's a whole medical record in here. I can pull out – you want me to get the JA site? I can absolutely get you the appendix site. But she went to the doctor and said this was in January. She was talking about the vaccine, and she said he got sick two weeks after. Well, but, I mean, you're a mother. Now you're in January two months later. Your child has missed a couple days of school. You think, okay, they're better. You send them back, and then you realize they're very sick, and I need to take them back to the doctor. So what she remembers as the pointed thing is that time when she had to go back to the doctor two weeks later. That doesn't mean that it wasn't true that he missed school for two days. But even when she went to the doctor two weeks after, she said he's been sick. He's for two- to three-day fever. She didn't say since the day of the vaccination. Well, because he had to have been the whole day, right? I mean, think about it. She went to the doctor, and she said he has had a fever for the last two to three days. She didn't take him on day one when the fever onset. So suppose that right after the vaccine, he had a two- to three-day fever, which the record is consistent with by virtue of him missing school, and that is, in fact, her testimony. Well, and then it abated, so she sent him back to school. Then it reoccurred. I mean, the record is consistent. Your Honor, I would say two points. As to the specific point, the special master also found that she very often brought him immediately to the doctor for things exactly like that, and it was an inconsistent pattern. And I hear all of your arguments. And these are arguments that if you were the special master, might have persuaded you. But the special master did what he was supposed to do. He looked at all the record evidence. There's nothing implausible or irrational about the decisions that he made, either on the mother's testimony or on the fact that the government rebutted the medical theory. But wouldn't we be concerned that case after case after case comes up from this special master, and this special master tries to cabin all of his findings into credibility determinations, and now, even with respect to people he didn't witness? Your Honor, I think that's a mischaracterization. Part of it was a credibility determination, but then on remand, it was about medical theory and weighing the overall evidence. And, yes, I was here with this special master and the same Court of Federal Claims a little more than a year ago in Paderak, in which it was the same thing. It was a review of the whole record, and the Court of Federal Claims took what was essentially a de novo look at all the records, not an arbitrary and capricious standard. And this Court reversed, saying under arbitrary and capricious review, that's not what you do. You have to look at whether the special master was rational and pointed to the record evidence, and that's what he did in this case, just as he did in Paderak. It's not for the Court of Federal Claims or – You know what? We better give him a chance. Yes, Your Honor. Because you're going to want some of your rebuttal time back. So you've used all of it, so I'll give you some back. Thank you, Your Honor. But let's let Mr. Friedlander come on up. Thank you, Your Honor. What I fail to ever understand in this case is that my opponent is the Secretary of Health and Human Services. That's the client. The two men, Dr. Oleski and Dr. Bell, were the chairmen of Chronic Fatigue Syndrome for the defendant. And yet, the defendant has given no credibility to these two doctors and their opinion. Well, let me focus on Dr. Bell for a minute. And this, I guess, in my view, this is focusing on Kong, too. But Dr. Bell, who is admittedly extraordinarily highly qualified, his testimony, his assumption – and he called it an assumption – that, in fact, the hepatitis B vaccine caused the chronic fatigue syndrome in this case. But that testimony was predicated on the belief that prior to the date of that fourth vaccine, the child was healthy. And yet, the entire year before, he's gone through Epstein-Barr and constant reports to the doctor. He's missed months of school. I mean, how can we say that – I mean, obviously, he's doing a differential diagnosis. And he said, well, he was completely healthy before. Now he has a vaccine, and now he's sick. And I think he's got chronic fatigue, so therefore, it must have been caused by that. I mean, he believes that there's a theory that allows it. But how do we say that that is something that is reliable or that at least the professional master wasn't allowed to discount it when it's predicated on a false assumption? Well, in the first place, Your Honor, he did – his testimony is quite lengthy because he appeared twice. And he went to explain, this is a child – I use the word weakened immune system. He had problems. That's obvious in the record. And historically, because his father has immune deficiency. But from July to November of 2001, he didn't have a problem. He went to camp. He went to Disney World. I mean, he played soccer. He was preparing for a tap dance recital of some sort that he was going to go to. Yes, he did have problems. He had mononucleosis the year before. But he was better. And he was a weakened person, but he was healthy. And what Dr. Bell did, which was not any other doctor, he actually went to Norfolk and he spent three hours examining the child, interviewing the parents, and as he testified, you know, I've been doing clinical work for a long time. He didn't say, I'm an expert in chronic fatigue syndrome, but I am, as his record shows, a clinical doctor, practicing doctor. He relied on what the parents were telling him? Well, that plus his own... I'm just trying to get that out, because there's some question in the case as to whether or not the court of medical claims was correct in rejecting the discounting of that testimony. Yes, Your Honor. He did rely on what the parents told him. If we were to conclude that the special master was correct the first time around when he discounted the mother's testimony, right, if we were to conclude that, then that would bleed into what you're telling us right now about the doctor's testimony. But he also was interviewing the child. Now remember, this occurs in 2004. The event occurred in 2001. Well after the fact. But one of the things that bothered me the most about Dr. Bell's testimony is that he was very explicit, that he said, this child rarely ever got fevers. And you go back through the medical history, and from the time he was a baby, from the time he was about a year and a half old, constant reports of fevers throughout the course of his entire medical history. So, I mean, that was an assumption, an important assumption in my view, that Dr. Bell was making. Why isn't that alone enough to raise questions about his testimony? Well, the only way I can look at it, Your Honor, is to say that there were actually five doctors who contributed their opinions. Two of the doctors got it wrong. They wouldn't make a diagnosis of chronic fatigue syndrome, even though they claimed that they had dealt with many, many of those patients. Dr. Wineson said, I can't make a diagnosis until there's been a psychiatric examination, and even though there was a psychiatric examination. Well, who did really make a diagnosis of chronic fatigue syndrome? Has there been a diagnosis? Other than the judge. Oh, yes, Dr. Parker. It's in the file. It was after the hearing, Dr. Parker, he was taken to Dr. Parker, who said, this child, from a psychological point of view, is fine. The psychology. The psychology, but did he make a diagnosis of chronic fatigue syndrome? Yes, he did. I couldn't find anywhere in the record that there had been a diagnosis. I don't know. I can't say off my memory whether he addressed that or not. Dr. Parker was addressing his mental condition. Right, so there had not been a diagnosis. There was no actual diagnosis of chronic fatigue syndrome. There is a later reference by Dr. Fink that says, I, as a treating physician, will just accept Dr. Bell's proposition. Your Honor, I don't think there's any question about it at the end of 13 years. This is a child with chronic fatigue. And you have the testimony of Dr. Lange. But there hasn't been a diagnosis. Well, Dr. I mean, the mother has said that, right, and other people have said, well, but what Judge O'Malley and I were getting at is we didn't see anywhere in the record that there had been an actual diagnosis of the ailment for which relief is being claimed. But Dr. Bell said he had chronic fatigue syndrome. Dr. Oleski, and of course, he had made an examination. They just said they assumed it was chronic fatigue syndrome, correct? Well, no, I don't think that he said, I assume. He was talking about assuming the link. The word assume is in his testimony. But if you recall in his testimony, he said, while I was examining the child, I was tapping the pencil. He said, this is part of my diagnosis because a person with chronic fatigue syndrome has trouble answering the questions when I'm tapping my pencil because chronic fatigue syndrome means that you can't multitask. You focus on one thing. And when he was tapping the pencil, it interrupted the child's ability to answer the question. He testified to that in that first hearing. I remember it so clearly because I was amazed at hearing it. That's a symptom, but not a diagnosis. Well, but he made a diagnosis. He said, if you have all of these various events that occur and you end up with a child, Dr. Lange Why was it an error for the special master to reject the idea that your client had proven a temporal relationship between the vaccine and the onset of symptoms? The question, Your Honor, is why was it an error for him to make that? Right, well, you know, we can't re-weigh the evidence. And so I've got to review his fact-finding to decide whether it's arbitrary or capricious. How was it arbitrary and capricious? Well, that particular point was that there was the notation in the diary. He said, I reject the mother's testimony. He didn't see her, but he said in reading the record and so forth, I reject her testimony. But the diary was written at the time. Well, it just said he missed school. No, the diary knows. If you lay the data points out on the table, it looks like there are two very strong data points in favor of your client, which was the school record indicates that the child was not in school the first two days after the fourth vaccination. Right? Yes, sir. And what the special master does is put other things on the table, because to add up all the facts to see which way the scale tips. And the special master is discounting the testimony of the mother. It's pointing out that the mother took the child to the hospital or to the doctor whenever anything was wrong. All that testimony is in the gamish. And so you have other than, say, from your perspective, other than the testimony that's been discounted, you have the two days that were in school as your strongest evidence. Right? Well, plus we say the mother saw it. He wanted to discount the mother's diary. But he also discounted the diary because it was inaccurate in lots and lots of places. And it was also inconsistent with the mother's testimony, too, about the severity of the fever and when the fever onset and when he first got sick. The diary was inaccurate. Lots of places the diary said he was out of school for the entire month of December, when, in fact, he wasn't. School records show the contrary. Your Honor, you have to think of the stretch of time. Here is a mother who's had a child and problems. Now the child is well. The child gets the vaccine he doesn't need. Well, the fact that he doesn't need it's irrelevant. Well, it's only relevant as to the fact that it created... Well, I mean, it's very unfortunate because if it hadn't happened, we wouldn't be here today if it hadn't happened, right? The cascade of cytokines that followed. And remember, you have the vestibular neuritis that followed at the end of November. All of these things are the symptoms. Chronic fatigue syndrome cannot be diagnosed until after six months and you see all of the symptoms. And the treating physician did diagnose him as having chronic fatigue syndrome after a period of time. Let me ask you about Dr. Fink's Bayer's report because you put a lot of emphasis on that, as did the court of claims judge. The problem is that Dr. Fink specifically says in that, I've been asked to file this report. They asked me to file this report. And he filed it years after the episode and right around the time that the petition is filed. So how is that a meaningful report by a treating physician when it's actually the family that is urging him to file it? I believe, Your Honor, if you read all the records, you'll see that Dr. Fink, and particularly in his testimony, doesn't and wouldn't do anything because somebody just asked him to. He was really concerned about the child. He was really a doctor being a doctor, and he would not have filed that report. Then why did he go out of his way to say in the report that he was asked to file it? Because he's totally honest. I mean, here's a man. Why does he file it years later when you're in the midst of litigation rather than when the events occur? Well, I cannot answer why he did that. I only know that Dr. Fink, in the course of the 11 years of this litigation, has always been very straightforward, honest. He calls it the way he sees it as a doctor when he's treating a patient. But the question that was asked, was there ever a diagnosis of chronic fatigue? If you read Dr. Gundon Langdon's report, you'll see that this child is severely crippled by having chronic fatigue syndrome. No question. Well, part of the problem is the medical evidence, including all these entries by Dr. Fink, seem to indicate he suffered from virtually identical symptoms forever, well before the onset. That's why the difficulty I'm having, which is somewhere that Judge O'Malley started, was accepting Dr. Bell's testimony in the event that it was predicated on an inaccurate understanding, namely that the child did have a long-term history of chronic fatigue that preceded the vaccination. He had mononucleosis. Well, he recovered from mononucleosis. The mono was in March, and the Fink report on page 207 indicates his recovering, and then she took him again to the doctor multiple times as late as July 2nd, complaining, saying, he is fatigued again. At times he has to be carried around. There was no evidence that the mononucleosis was continuing. This is months later, and yet, in fact, there's one point in May where he says it's possible the child has strep, because that was another fatigue complaint by the mother. But she's been treating him with antibiotics, so it's impossible to know for sure if that's causing the fatigue. The problem is I feel like the special master may have, whether I would have found it myself de novo is a different question from whether there may exist substantial evidence in the record for him to have rejected Dr. Bell's opinion as based on an inaccurate fact. Well, you have Dr. Bell, and you also have Dr. Olasky's opinion. Do we know why Dr. Bell seems to have misunderstood the child's medical history? I can't answer. I could not answer. That's not in the record? Do we know, for example, whether he actually, did he indicate, I don't remember, in his opinion, that he had reviewed all of Dr. Fink's entries? Do we know whether? I think that he said that he had, and keep in mind, there were two hearings in which Dr. Bell and Dr. Olasky and Dr. Fink appeared, in person in Norfolk in 07, then in 10 by telephone here in Washington. That is, the hearing was here. And at that time, they were all expressing their views that we have discussed. He has chronic fatigue syndrome from the vaccine, but there was no answer by the government, which has never been addressed. I didn't see Dr. Fink's testimony saying that. Did Dr. Fink testify that he concluded he had chronic fatigue syndrome because of the vaccination? I don't remember him testifying that. No, he wrote a letter, and he said in his letter. He was relying on Dr. Bell. He relied upon Dr. Bell's opinion. He didn't independently make that determination. No, he said, I rely on Dr. Bell because Dr. Bell. That's a problem, then, if we were to conclude that Dr. Bell's testimony is subject to question because he misunderstood the medical background of the trial. If Fink is relying on Bell, then Bell is discounted, then Fink gets discounted, right? He was trying to get the chain here. Keep in mind that in the second hearing, which lasted, I think, about six hours, we had the testimony of Bell, we had the testimony of Fink, we had the testimony of Valesky. And we were waiting for the testimony of Dr. Weinstein. But the government elected not to call him back, even though my argument at that point was, now the ball's in your court because you said you conceded he has chronic fatigue syndrome. The government conceded that, but that it was caused by the Epstein-Barr virus. Dr. Weinstein is the one who said it. We were waiting for him to come back. They elected not to call him back. And therefore, the burden, in our opinion, shifted to the government. Okay, well, we're well beyond our time, so I need to let Mr. Waldman have three minutes of rebuttal time. Thank you, Your Honor. I would just like to emphasize the appropriate standard of review in this case. In Munn and Hazelhurst and many other cases, you have called the standard uniquely deferential to the special master, the most deferential possible, and extremely difficult to show reversible error. Let me just ask one question. It seemed to me that it was very important from the point of view of the court of federal claims that the special master had discounted the mother's testimony. She's the eyewitness of the events that are happening. Grandmother may not see as well or whatever. Okay. And so the discounting is on the basis that the special master failed to appreciate that the mother had medical training. Isn't that correct? That's what the court of federal claims said. That's what they said, right? Yes. Do you understand there being any other ground? No, I don't. On which to discount. No. Okay, so what's wrong with the court of federal claims saying a special master can't discount the mother's testimony and must instead give credit to the mother's testimony because of the mother's medical background? As a matter of fact, special master didn't even recognize that the mother had this background. I think for two reasons. Number one is pointing out her medical training doesn't at all show why the findings were arbitrary and capricious. And if you'd want to vacate the factual findings, you have to show that they're arbitrary or capricious. And second, the reason why they're not arbitrary and capricious is because all of the inconsistencies that he found and how the record contradicted the testimony have nothing to do with her medical training. The basis for finding her not credible had nothing to do with that. If anything, you would think that a consistent depiction of the symptoms would be more readily found in someone with medical training than without. So if anything, I think it cuts against the petitioner, not in their favor. But certainly the Court of Federal Claims never explained why the fact of her medical training would make the findings arbitrary. People with medical training can be credible or not credible, too, just like anyone else can, just like a layman can. But you have to show that your account is credible to the fact finder. The fact finder here did not find that to be credible. Neither did the special master found the medical evidence to be in petitioner's favor. He found it in the government's favor. And you can certainly marshal evidence that supports the petitioner. And the special master said as much. But as Judge Moore said, whether you would have come to the same conclusion on this evidence de novo is not the question. What's the big issue here for you? You guys don't appeal very much. You're from civil appellate. You've swooped in. What's the big issue? Are you afraid that the CFC is going to consistently start applying the wrong standard of review? Yes, in theory. You could appeal any decision you just think is flat out wrongly decided on facts. But you don't usually do that. So what's the big issue? Don't worry about the facts. Can I answer it? Okay. I think that there are a couple of things. Number one is it does appear to me and to us as a department that there's a fundamental misunderstanding as a matter of law of what the correct standard should be. And just to give you a couple answers. In application. She didn't parrot the wrong standard anywhere. So you mean the application and the fact that she reversed citing all these factual things that she was just reaching a different factual finding on evidences that even if she had parroted the correct standard, she didn't apply it correctly? Right. But there's a couple of – there are things, I think, that are particularly salient in this case. For example, there was criticism by the Court of Federal Claims of the special master for engaging in sort of a review of the entire record and independent fact finding, which, of course, is the role of the special master and not the role of the Court of Federal Claims. The Court of Federal Claims said things like I don't need to show evidence of timeframe. You don't need reliable medical evidence. So just to correct you on one little point that's not really relevant to your case, but I just can't help myself. Sure. The standard of review section says if the Court of Federal Claims rejects the special master's findings, it should issue its own findings of facts and conclusions of law. So when you say – that's the statute. I realize that's a really bizarre section, but when you say she had no right to find findings of fact, actually, I think that's the statute. And the standard of review says if she's rejecting the special master's fact findings, she has a right to then issue her own. The word if is the big qualifier. If she finds it arbitrary, and she must first find it to be arbitrary, meaning there was no review of the – the relevant evidence was not examined or the inferences from the evidence were not plotted. Your problem isn't that she found facts. Your problem is that she found facts in a situation where she wasn't entitled to because she didn't properly apply the arbitrary and capricious standard. I agree that the statute could be read to allow for de novo fact finding if you first find it to be arbitrary and capricious. But what you can't do is fail to point out whether it's arbitrary or capricious and then just have your own fact finding. That's not permitted under the statute. And I think that there's also some pattern with this particular special master and the Court of Federal Claims that bears on this case as well. Thank you, Mr. Waldman. Thank both counsel for their arguments. The case is taken under submission. All rise.